Filed 1/16/14  Amanda F. v. Super. Ct. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| AMANDA F., | |
| Petitioner, | |
| v. | |
| THE SUPERIOR COURT OF ORANGE COUNTY, | G048960 |
| | (Super. Ct. Nos. DP023662, DP023663, DP023664, DP023665) |
| Respondent; | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY et al., | O P I N I O N |
| Real Parties in Interest. | |

Original proceedings; petition for a writ of mandate to challenge an order of the Superior Court of Orange County, Kimberly Menninger, Judge.  Petition denied.

Amanda F., in pro. per.; Newmeyer & Dillion and Francis E. Quinlan for Petitioner.

No appearance for Respondent.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.

Lawrence A. Aufill for Real Party in Interest the Minors.

\*　　　　\*　　　　\*

Amanda F. (the mother) petitions for extraordinary relief from juvenile court orders made at disposition removing her four children from her custody and placing them with the father. The sustained petition under Welfare and Institutions Code section 300, subdivision (b),[1] alleged failure to protect, primarily related to the deplorable condition of the mother's home and her unresolved substance abuse problem. The mother, representing herself during briefing, argues the court erred in numerous ways, each of which is without merit or improperly raised here. The petition is therefore denied.

I

FACTS

*Detention*

On April 5, 2013, the mother's four children, ages four to twelve years were detained by the Orange County Social Services Agency (SSA). The home was observed by a Newport Beach police officer and an emergency response social worker "to be in a deplorable and unsafe condition." The home was described as having "a horrible stench of dog feces, urine, and rotting food. . . . There were plates of old food on the counters, tables and floors. Dirty dishes with spoiled food were observed on all

---

[1] Subsequent statutory references are to the Welfare and Institutions Code unless otherwise noted.

2

kitchen counters and in the sink. The plates were covered with gnats and ants." Additionally, the hallways and paths through the rooms were inaccessible due to piles of trash and other belongings. Empty vodka bottles were found, and in the mother's night stand, a methamphetamine pipe and prescription drugs not prescribed to the mother were also found within the children's reach. The mother was arrested for child endangerment. The children were placed in the custody of the maternal grandmother, Kathy F., who lived downstairs in the same duplex as the mother and the children. The father, Mario B., lived in Yuma, Arizona.

As amended and later sustained by the court, the petition alleged failure to protect under section 300, subdivision (b). The sustained petition listed the unsafe condition of the home and the mother's potential unresolved substance abuse problem as the reasons for detention. The petition indicated the mother and the father had a history of domestic violence, although the father denied this. The father also had a criminal history including drug and theft-related crimes.

At the detention hearing, the court found that detention was necessary and made appropriate temporary orders. Services were ordered for the parents, including drug or alcohol testing by way of observed specimen collection or other approved means. Six hours a week of monitored visitation was ordered for the mother after her release from custody, and a minimum of six hours a week was ordered for the father while he was in California. The court also ordered monitored phone calls for both parents. Pursuant to the court's order, SSA sent an Interstate Compact on the Placement of Children (ICPC) to Arizona for possible supervision and provision of services.

*Jurisdiction/Disposition Reports*

On May 8, Senior Social Worker Curtis Vaughn submitted a combined jurisdiction/disposition report, and he later filed several addendum reports. He recommended the court sustain the petition, offer reunification services to the parents,

3

and consider suitable placement with consideration to relatives. The ICPC was still pending.

In summary, he believed the petition to be essentially true, and both the condition of the home and the mother's alcohol and drug use placed the children at risk. He based his opinion on the reports of the children and the mother, previous social services reports, and pictures provided by the father. Vaughn also believed the accounts of prior domestic violence between the parents and of inappropriate physical discipline by the father. He opined, however, that none of these were recent, specifically since the parents' separation three years earlier. He believed the father had a past drug problem, but there had been no evidence of it in the past five or six years. The father also appeared to have overcome his prior criminal history, with the exception of the mother's reports that he had violated restraining orders.

There had, apparently, been an ongoing custody battle during which each parent accused the other of abuse and neglect. A family law case for this family existed in Arizona, with the mother awarded custody and the father given parenting time. There was also a prior Orange County family court case. Until December 2010, the children lived in Arizona with one or both parents. The mother then moved to Orange County to live with Kathy while the father stayed in Arizona.

In July 2012, when the mother was allegedly under arrest in Arizona, the father came to Orange County to pick up the children, who reportedly did not want to go with him due to prior physical abuse. This resulted in police and SSA investigations, which were ultimately determined to be inconclusive or unfounded. Around that time the mother stated she had completed a drug program in May 2010, and denied using drugs or drinking alcohol. She claimed the father had harassed her for the past several years, and it was reported there was an ongoing child custody dispute. The mother also said she had been the victim of domestic violence during their relationship. Shortly after and

4

apparently in response to the children's detention, the Arizona court granted the father temporary legal and physical custody.[2]

Vaughn's report also recounted the events immediately preceding detention. Police visited the mother's home because Matthew, age 12 had been missing school, and they observed the home's condition as recounted in the detention report. The mother, for her part, agreed the home was "horrible," and said she was depressed because of ongoing violence by the father. She denied using prescription drugs and said she did not know how the methamphetamine appeared in her home.

According to the detective who was present at the home, the drugs were found in the room the mother identified as hers, and the items found included a clear glass pipe with burnt methamphetamine residue inside. The police also found a prescription bottle for hydrocodone prescribed to the father. These items were discovered in a night stand drawer approximately two feet off the ground and therefore easily accessible by the children. The detective believed the mother had used methamphetamine recently because he observed thick white residue on her lips and around her mouth, and she had a high pulse rate. When asked, Matthew denied drug use in the home, but stated the mother put vodka in her coffee.

Arizona Child Protective Services reported involvement with the family in 2006. At the time, the father was in prison, and the mother's home and the children were reported as "filthy." Signs of methamphetamine use were also observed, and the mother refused to drug test. Kathy told CPS the mother had a drug problem. As an alternative to services, the mother gave Kathy guardianship.

---

[2] In May 2013, the juvenile court conferred with the Arizona family court pursuant to the Uniform Child Custody Enforcement Act. In June, the court concluded it had emergency jurisdiction.

5

In late 2006, the father was released from prison and reunited with the mother. Both parents agreed to do services, and both tested positive for methamphetamine.

When asked about the petition, the father said the mother had a long history of substance abuse, which included the use of methamphetamine and prescription drugs. He showed the social worker pictures from 2010 of a very messy home. The father denied the accusations of domestic abuse, stating they were the result of custody disputes. The three older children, however, described domestic violence that occurred several years prior. Several restraining orders had been issued against the father, which the mother alleged he violated.

The children also reported physical abuse by the father when the family was still living together, including striking the children on their bottom or legs with objects such as a belt. The children stated this stopped after the parents separated, and during visits, the father no longer hit them.

With regard to the father's criminal history, he admitted various convictions from 2005 to 2007. He stated he had completed a two-year program that included probation, counseling, support groups and drug testing. The father also acknowledged prior drug use.

Since detention, the children had done basically well. The visits with the father were positive, although the older children were initially resistant. The visits themselves went well, and the children expressed desire for future visits, although Alexa, age 10, remained somewhat ambivalent. The children also enjoyed visiting with the mother. When asked where they wanted to live, the children's preference was generally Kathy or the mother.

Vaughn was concerned, however, that the mother was not participating in services. The mother's services included general counseling to address physical abuse, domestic violence, and substance abuse, completion of a personal empowerment program

6

to address domestic violence, completion of an approved outpatient substance abuse program, and substance abuse testing with observed specimen collection. The mother refused to sign her action plan until the court ordered her to do so. She missed multiple drug/alcohol tests, including eight tests in May. She received one negative test in July, which was the only date she tested through August.[3] She did not enroll in a personal empowerment program or approved counseling, but obtained counseling on her own. Her therapist reported he had only seen her twice as of early June. According to Vaughn, the only thing she had done to address the reasons for detention was to clean the home. The father, however, did his services, including drug tests that returned negative. (He did miss several early tests.)

With respect to the Arizona ICPC, the evaluator recommended placing the children with the father pending completion of several items, including employment.

*Hearings*

At the jurisdiction hearing on June 18, the father pled no contest, and the mother submitted on the reports. The court sustained the amended petition and found the children were dependents under section 300, subdivision (b).

On September 3 and 4, the court held a disposition hearing. As relevant here, the mother submitted several exhibits, including her independent drug tests, a modified restraining order, dated August 12, 2013, against the father, two completion certificates from four-hour parenting classes, and pictures of her home. She also attempted to submit typed letters from Matthew and Alexa stating they feared the father and did not want to live with him. Matthew's letter also stated minor's counsel was "mean and disturbing." The court did not admit the letters.

---

[3] The mother, apparently without SSA's knowledge, drug tested on her own three times in August. These tests were not random, nor was specimen collection observed. The tests were negative, but one of the specimens was diluted.

The mother testified that she wanted the children returned to her. She admitted missing all but one of the tests from SSA's provider, complaining about the location and cost. She produced three negative (though one diluted), unobserved, nonrandom tests from a different provider, all completed in August. She testified that she completed two four-hour parenting classes and three counseling sessions she located herself. The counseling focused on her general mental health and domestic violence issues. She also testified the felony child endangerment charges had been dismissed.

The father testified that a recent visit to his home by the children had gone "great," and the children kept saying they were glad to see him. He stated he was doing services as SSA had specified, including drug testing and counseling. He denied hitting the children with anything but an open palm on one occasion. He claimed the mother prevented him from seeing the children, necessitating repeated court orders to visit.

Matthew testified that he wanted to live with the mother or Kathy and that the father was his third choice. He wanted to stay in California. He did not like visiting the father because it was really hot and he had no friends there. He also testified his older cousin had grabbed and hit him, and also hit one of the younger children and the father had not done anything about it. The younger child was scared the father might beat him again. He described abuse by the father prior to moving to California, but said the father had not physically disciplined the children during visits. He loved both his parents and his grandmother.

Alexa testified that she wanted to live with the mother and Kathy. She denied seeing drugs or paraphernalia in the mother's home, though she admitted it was messy. She did not want to live with the father because she was scared of him. Like Matthew, she described earlier abuse, but stated there had not been physical discipline since she moved to California. She said the father had been violent toward the mother when they lived together. She, like Matthew, was scared by the older cousin at the father's house, but she still wanted to visit the father sometimes.

8

At the conclusion of testimony, counsel for SSA asked the court to remove the children from the custody of both parents, order services, and keep the children placed with Kathy. If the pending ICPC had been approved, counsel indicated that SSA would have recommended placement with the father. Mother's counsel argued the children should be placed with Kathy while the father and the children's counsel/guardian ad litem contended they should be released to the father. While the children's counsel noted the children wanted to stay with Kathy, counsel was concerned for their emotional well-being. Counsel was concerned Kathy had alienated the children from the father, among other issues.

The court declared the children dependents and removed custody from the mother. It also found that placement with the father would be detrimental due to Matthew and Alexa's fears.[4] Services were ordered for both parents. The court then explained it was inclined to place the children with the father, who had complied with SSA while the mother had done nothing. The court ordered SSA to retain jurisdiction to remove the children quickly should any problems arise. While the court did not entirely believe Matthew and Alexa's testimony regarding prior beatings, it could not be disregarded, and the court therefore intended to monitor the situation for six months to ensure the children's safety. The court felt that both children needed counseling, and it had mixed feelings about whether they had been coached to report abuse. Thus, the court placed the children, with the exception of Matthew, with the father on a trial release. Matthew remained with Kathy, with visits with the father every other weekend, though he, too, might be placed with the father at some point.[5] The court ordered drug testing for the father upon reasonable suspicion, and a drug patch for the mother.

---

[4] See *Request for Judicial Notice, post*.

[5] Indeed, this appears to have been the case. Matthew was placed with the father in late September. See *Request for Judicial Notice, post.*

9

II

DISCUSSION

The mother represented herself in this writ proceeding until a few days before oral argument. Her petition and memorandum of points and authorities (the mother's brief) are not particularly well-organized and are occasionally difficult to parse. The mother's brief violates the California Rules of Court in numerous respects, including the duty to support each point by argument, and where possible, by citation to authority. (Cal. Rules of Court, rule 8.204(a)(1)(B).) To the extent not mentioned below, any such arguments are deemed waived. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852; *In re S.C.* (2006) 138 Cal.App.4th 396, 408.)

The mother's brief was filed with a separate volume of exhibits. (The mother cites to page numbers of these exhibits, but the pages themselves are not numbered.) To the extent these exhibits are not included in the record on appeal, they are not properly before this court and shall be disregarded.

*Request for Judicial Notice*

SSA requests that we take judicial notice of three documents, all relating to a November 4 hearing. At that hearing, the juvenile court reversed its prior finding that placement with the father would be detrimental to their safety, protection or physical or emotional well-being. The first document is the court's order, the second is a stipulation to the order by all parties, including the mother, and the third is SSA's request for the order, which includes an SSA interim report. The request reflects Matthew's placement with the father in September, and states that "all children seem to have adjusted to their placement with their father and are no longer fearful." SSA argues these documents are directly relevant to, and indeed moot, one of the mother's arguments in this writ proceeding. The mother did not file a timely objection to the request for judicial notice.

10

An appellate court may take judicial notice of court records outside the record on appeal. (Evid. Code, §§ 459, subd. (a), 452, subd. (d).) Given that these are records from the trial court and directly relevant to this proceeding, the request is granted.

*Dispositional Findings*

To justify removal from the parent's custody, the juvenile court must find by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) We review orders for removal to determine if they were supported by substantial evidence. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.)

"The issue of sufficiency of the evidence in dependency cases is governed by the same rules that apply to all appeals. If, on the entire record, there is substantial evidence to support the findings of the juvenile court, we uphold those findings. [Citation.] We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or evaluate the weight of the evidence. Rather, we draw all reasonable inferences in support of the findings, view the record most favorably to the juvenile court's order, and affirm the order even if other evidence supports a contrary conclusion. [Citation.] The appellant has the burden of showing the finding or order is not supported by substantial evidence. [Citation.]" (*In re Megan S.* (2002) 104 Cal.App.4th 247, 250-251.)

Section 300, subdivision (b) applies where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . or by the willful or negligent failure of the parent or guardian to

11

provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." (§ 300, subd. (b).) Proof consists of three elements: "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.)

This is not a close case. The mother argues that a messy house alone is insufficient to justify removal, but that is a straw man in this case. The condition of the house was secondary to what was apparently an ongoing and unresolved substance abuse problem.[6] During the four months between detention and disposition, the mother missed all but one court-ordered test and offered only the tests she conducted on her own, which were neither random nor conducted to court specifications. One of those tests was nonetheless diluted. These facts, along with the mother's submission on the SSA reports at the jurisdiction hearing, supports the court's conclusion the need for removal was supported by clear and convincing evidence, and further, that the children would be in substantial danger if they were returned. (§ 361, subd. (c)(1) [the jurisdictional findings are prima facie evidence that the child cannot safely remain in the home].)

Additionally, the juvenile court was justified in concluding there were no reasonable alternatives to removal. The mother had refused to cooperate with SSA with regard to services, instead choosing to find programs that did not meet SSA's requirements. Her counseling sessions, for example, did not focus on the reasons the children were detained. By the time of the disposition hearing, she had done nothing to resolve the issues leading to detention with the exception of cleaning her house. The court's conclusions, therefore, were supported by substantial evidence.

---

[6] Contrary to the mother's apparent belief, the dismissal of criminal drug charges does not resolve the issue for the juvenile court.

*Placement with the Father*

The mother argues that the court erroneously placed the children with the father after finding that placement with him would be detrimental. This is correct under section 361.2, subdivision (a), which requires placement with a noncustodial parent *unless* the court finds it would be detrimental. But the court, pursuant to a stipulation between the parties, found shortly thereafter that returning the children to the father would *not* be detrimental. Thus, this argument is moot.

The rest of mother's argument regarding placement with the father is based entirely on credibility issues, which we do not revisit in this court. Nor do we reweigh the evidence, but the mother is asking us to do precisely that. (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1177.) She argues the court should have relied on the children's testimony and the father's history. But the court expressly called into question the children's testimony, suspecting the mother and Kathy had coached them. The minors' counsel believed the children would be safe with the father and urged placement with him. The father had successfully completed rehabilitation programs and visits between the father and the children had gone well. There was more than substantial evidence for the court to conclude that placing the children with the father would not be detrimental, and we decline to disturb that ruling.

*Restraining Order*

The mother argues that the criminal restraining order prevented the juvenile court from placing the children with the father. As noted above, the record demonstrates that on August 12, 2013, the criminal court apparently modified an earlier restraining order against the father. The mother is listed as the protected person. The order prohibits the father from approaching within 100 yards of the mother or contacting her himself or through third persons except for attorneys.

13

The mother cites to Penal Code section 136.2, subdivision (a)(6) for the proposition that the children are automatically included in the restraining order. That section states, in relevant part: "[A] court with jurisdiction over a criminal matter may issue orders including, but not limited to, the following: [¶] . . . [¶] (6)(A) An order that a particular law enforcement agency within the jurisdiction of the court provide protection for a victim or a witness, or both, or for immediate family members of a victim or a witness who reside in the same household as the victim or witness or within reasonable proximity of the victim's or witness' household, as determined by the court. The order shall not be made without the consent of the law enforcement agency except for limited and specified periods of time and upon an express finding by the court of a clear and present danger of harm to the victim or witness or immediate family members of the victim or witness. [¶] (B) For purposes of this paragraph, 'immediate family members' include the spouse, children, or parents of the victim or witness."

This subdivision does not appear to apply for various reasons, starting with the fact that the order at issue does not order that a particular law enforcement agency provide protection for the mother as a victim of a crime. It is merely a stay-away order. The conclusion that the order was not made under this provision is bolstered by the fact that it does not include any of the other requirements, such as being constrained to a limited or specified period of time. Thus, this provision simply does not apply. Moreover, even if it did, the order would not include the children because the mother and the children were no longer residing in the same household — the children had been removed.

The facts on the ground also indicate that nobody involved in this case was behaving as if the restraining order, which had been in effect since November 2012, applied to the children. As noted above, the Yuma court had issued various orders pertaining to the visitation schedule, and the children and the father had spent time

14

together during that period.  We conclude the juvenile court had no reason to believe that the restraining order prevented contact between the father and the children, and we agree.

*Notice of the Hearing*

In a one-paragraph argument bereft of authority, the mother claims that the minors and maternal grandmother were not properly notified of the hearing on September 3.  She cites to two unauthenticated e-mails not included in the record.  There was, apparently, confusion regarding this hearing, but both the minors' counsel and the grandmother were present.  The minors came to court the next day, and Matthew and Alexa testified.  An actual appearance waives any claim of improper notice, and even if notice was improper, no prejudice to the mother resulted.

*Due Process*

In a one-line argument, the mother claims her due process rights were violated because Vaughn, the social worker, was not cross-examined.  The record reflects that the social worker was in court and available for examination, but none of the parties called him to testify.   Because the social worker was available, the mother cannot establish a due process violation.

*Matthew's Request for New Counsel*

In another brief argument without citation to authority, the mother claims the court erred by not accepting Matthew's request for new counsel.  This request was made in a letter to the presiding judge on September 4, 2013, after the disposition hearing on September 3.[7]  While the letter Matthew purportedly wrote is included in the mother's

---

[7] This is a different letter than the one in which Matthew stated his counsel told him "mean and disturbing things."  That letter did not request any specific action on the court's part, merely that Matthew be "heard in court."

15

exhibits, there is nothing in the record to indicate what action the court took on this matter. Therefore, even if it is acceptable for the mother to raise this issue on Matthew's behalf, it is not properly before the court in this petition.

*Adequacy of Services*

The mother next argues (again, without citation to authority or legal analysis) that SSA did not provide her proper services. She lists a number of steps she did take, including attending two four-week parenting classes, attending three counseling sessions, completing four clean drug tests, and keeping her home clean and organized. She argues that SSA only completed one home visit during the six-month period and none of these achievements were included in SSA reports. The reports did, in fact, describe some of these matters, including two counseling sessions and the clean home during SSA's visit. There is nothing in the record to demonstrate that the parenting classes and drug testing completed outside SSA's purview were ever reported to the social worker.

What the record does show is that starting with detention, SSA provided service referrals and told her about the importance of services. The mother simply did not avail herself of the services in a timely, consistent manner.

Generally, the adequacy of services is evaluated later in the process, not in the relatively brief period between detention and disposition. The general rule is that "[d]ependency law requires a '"good faith effort"' to provide reasonable reunification services 'responding to the unique needs of each family.' [Citation.]" (*In re Maria S.* (2000) 82 Cal.App.4th 1032, 1039.) Here, there was substantial evidence from which the court could conclude that reasonable services had been offered to the mother and she had failed to participate. We find no error.

16

*The Mother's Assertion of the Children's Rights*

The mother also asserts in her petition (but provides no argument in her points and authorities) that the court violated the children's rights in numerous respects. She, however, cannot claim prejudice due to any such violations, and she has no standing to assert them. In order to have standing to appeal, a party must be legally "aggrieved" by the challenged ruling. (Code Civ. Proc., § 902; *Marsh v. Mountain Zephyr, Inc.* (1996) 43 Cal.App.4th 289, 295. To be legally aggrieved, a party's rights or interests must be directly and injuriously affected by the ruling. (*County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 737.) The mother provides no argument or authority that she is so aggrieved here. The children are represented in this matter, and their guardian ad litem may assert any such issues, if they exist, on the children's behalf. Even if the mother had standing, she has waived this issue by failing to provide reasoned legal arguments in support of her position. (*In re S.C.*, *supra*, 138 Cal.App.4th at p. 408.)

III

DISPOSITION

The petition is denied.

MOORE, ACTING P. J.

WE CONCUR:

FYBEL, J.

THOMPSON, J.

17